**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
MARIE ARENA,

                    Petitioner,

          -against-

SABINA KAPLAN, Superintendent of Bedford
Hills Correctional Facility,

                    Respondent.
---------------------------------------------------------X

**AMENDED**
**MEMORANDUM OF**
**DECISION AND ORDER**
11-cv-2722 (ADS)

<u>**APPEARANCES:**</u>

**Langone & Associates, PLLC**
*Attorneys for the Petitioner*
600 Old Country Road
Suite 328
Garden City, NY 11530
          By: Richard M. Langone, Esq., Of Counsel

**Nassau County District Attorney's Office**
*Attorneys for the Respondent*
262 Old Country Road
Mineola, NY 11501
     By:  Tammy J. Smiley
          Yael V. Levy, Assistant District Attorneys

**SPATT, District Judge**.

          The presently incarcerated Petitioner Marie Arena ("Arena" or the "Petitioner") brings

this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that she was

denied her constitutional rights through (1) prosecutorial misconduct that occurred during the

prosecutor's cross-examination of Arena; (2) rebuttal testimony that violated her right to

confront witnesses; (3) the ineffective assistance of counsel for her trial attorney's failure to

request a missing witness charge; (4) the denial of her right to present evidence to support her

claim that her confession to the police was involuntary; and (5) the Court's refusal to allow her to impeach another person's trial testimony. For the reasons that follow, the Court denies the petition in its entirety.

# I. BACKGROUND

## A. Factual Background

### 1. Steven Caramelli's interview

On January 25, 2001, Tom Cannata, the Petitioner's son-in-law, was shot to death. Steven Caramelli later pleaded guilty to attempted manslaughter in the first degree and criminal possession of a weapon in the third degree in New York state court in connection with Tom's killing. On August 13, 2001, Caramelli, who was awaiting sentencing, met with Assistant District Attorney William Dempsey and Detectives Gregg Lesmiester and Anthony Zacarese at the Nassau County District Attorney's Office. There, Caramelli told the Detectives of a conversation he had with the Petitioner, her daughter Marie Cannata, and Marie's husband, Tom, in early April 2000. Caramelli stated that Marie lived with the Petitioner and the Petitioner's boyfriend, Glenn Brockwell, at 30 Forest Avenue in Massapequa in Nassau County. Caramelli said that he was told by the Petitioner, Marie, and Tom that Brockwell abused the Petitioner and that they wanted him out of the house at 30 Forest Avenue. Caramelli stated that, several weeks later, Marie and Tom told him that the Petitioner would pay any amount of money to get somebody to kill her boyfriend, Brockwell. Caramelli then explained that he went away on vacation for approximately ten days.

Upon returning from vacation, Caramelli met up with Marie and Tom. Caramelli was told by Tom that he and Marie took care of the problem they had with Brockwell. According to Caramelli, Marie and Tom explained that, on Friday night April 21, 2000, at 30 Forest Avenue,

the Petitioner gave Brockwell some vodka and orange juice with valium to sedate him. Marie and Tom said that they and the Petitioner held Brockwell down on a couch and Joseph Caulfield injected Brockwell with six or seven bags of heroin. Marie and Tom stated that they, along with the Petitioner and Caulfield, carried Brockwell's body into the garage and left him there. Tom and Marie told Caramelli that they, the Petitioner, and Caulfield, later entered the garage and determined that Brockwell was dead. Marie and Tom said they, the Petitioner, and Caulfield, wrapped Brockwell's body in garbage bags, put it in the trunk of a car, drove to the Massapequa Preserve, and buried Brockwell in a shallow grave. Caramelli said Tom later told him that the Petitioner was nervous about the fact that they were only able to bury Brockwell's body in a shallow grave and she wanted to move the body.

A few weeks later, Caramelli said he was riding in Tom's car with Tom and Marie and stopped in the vicinity of the Massapequa Preserve. Caramelli and Tom exited the car, walked into the Massapequa Preserve, and Tom showed Caramelli where Brockwell's body was buried.

On August 13, 2001, Caramelli showed Detective Lesmeister the area in the Massapequa Preserve where Tom had showed him where Brockwell's body was buried. There, Detective Lesmeister observed a large group of broken branches on top of the overturned ground.

On August 22, 2001, at approximately 3:35 P.M. that day, the Petitioner and Caulfield were placed under arrest. The Petitioner was placed in the back seat of a police car with Detective Lesmeister sitting next to her and Detective Aponte driving. Caulfield was placed in a police car with Detectives Mullen and Brzeski.

Later that night, Detective Lesmeister returned to that same area of the Massapequa Preserve with a Suffolk County Police cadaver dog. The cadaver dog went directly to the area of

the broken branches that was shown to Detective Lesmeister by Caramelli.  Brockwell's remains were then unearthed from the Massapequa Preserve.

### 2.  The Petitioner's Interrogation

While in the car and on the way to Nassau County Police Headquarters, Detective Lesmeister introduced himself to the Petitioner and told her he was investigating the reported disappearance of Brockwell.  The Petitioner said she had not seen Brockwell in over a year and she did not know where he was.  Detective Lesmeister told the Petitioner that he knew where Brockwell was.  The Petitioner asked where and Detective Lesmeister explained that he had just dug him out of the ground.  At that point, the Petitioner turned away from Detective Lesmeister and sat quietly for several minutes.

Soon thereafter, Detective Lesmeister asked the Petitioner if her daughter, Marie, was home.  The Petitioner replied "yes" and Detective Lesmeister said, "good because I need to talk to her too." The Petitioner began to cry and asked if there is any way that the detective could leave her daughter out of it.  Detective Lesmeister said "no and no matter what you say to me, no matter what happens, I have to talk to your daughter."  The Petitioner began to cry hysterically and begged Detective Lesmeister to leave her daughter out of it.  Detective Lesmeister said that "he could make no promises and no matter what you say I have to talk to her."  The Petitioner pleaded, "I will tell you anything you want to know, just leave my daughter out of this."

Detective Lesmeister read the Petitioner her constitutional rights, and she and Detectives Lesmeister and Aponte signed a "rights card." The Petitioner then voluntarily waived her right to silence and an attorney and spoke with Detective Lesmeister, who asked her what happened to Brockwell.  The Petitioner related that Caulfield gave him a "hot shot." Detective Lesmeister asked her what she did.  The Plaintiff stated that she did not do anything but she was there the

night of the killing. The Petitioner stated that she, Marie, Tom, Caulfield, and Tierney O'Rourke were all present.

The detectives and the Petitioner then arrived at Nassau County Police Headquarters. The Petitioner was placed in an interview room inside the Homicide Squad with Detectives Lesmeister and Aponte. At this point, the Petitioner explained to the detectives that for most of the five years she and Brockwell were together, he abused drugs and beat her on a regular basis. The Petitioner stated that, at some point in 1999, she began to date Caulfield and did not tell Brockwell about it. The Petitioner further indicated that she had a few conversations with Marie, Tom, and Caulfield about Caulfield injecting Brockwell with a "hot shot" to kill him. When asked by Detective Lesmeister what a "hot shot" is, the Petitioner responded that she was not sure but believed that it was drugs or poison that would be injected to kill Brockwell.

The Petitioner stated that, on April 21, 2000, while at home, she had an argument with Brockwell, and he began to beat hit her. The Petitioner said she gave Brockwell vodka with orange juice and some pills to relax him, which it did. The Petitioner also stated that she called Caulfield and told him it was a good time to come over. The Petitioner also stated that when Caulfield came to the house, she, Marie, Tom, and Caulfield had a conversation on the second floor that they would go downstairs, hold Brockwell down, and Caulfield would inject him with a "hot shot" to kill him.

The Petitioner stated that Caulfield was concerned that Brockwell, a big guy, would foil their plan to hold him down. She indicated that Caulfield called O'Rourke, who then came to the house. The Petitioner said all of them, including Marie, held Brockwell down on a couch while Caulfield shot him in the right arm with a needle two separate times. She said that Brockwell soon became lethargic, after which Caulfield and Tom moved his body from the couch to the

garage and left him there. The Petitioner then stated that, two days later, Caulfield and Tom wrapped Brockwell's body in garbage bags, put the body in the trunk of her car, drove to the Massapequa Preserve, and buried the body.

Detective Lesmeister prepared a written statement reflecting the contents of this confession and read it to the Petitioner, who then read and signed the statement.

Although there is evidence that attorney Justin Lite spoke to the police during the missing person's investigation, those conversations were limited to a discussion of Lite's involvement with the Petitioner in a prior deed transfer and other civil matters. Lite acknowledged that he never told the police not to speak to the Petitioner in his absence. It is undisputed that Lite did not contact the police on the day of the Petitioner's arrest, when she made the written statement.

### 3. Caulfield's Interrogation

After being placed under arrest, Caulfield asked Detectives Mullen and Brzeksi what this was about. Detective Mullen said that he would like to talk to him about Brockwell. Caulfield was placed in a police car and read his constitutional rights. Caulfield said he understood his constitutional rights and then voluntarily waived his right to silence and an attorney and spoke with Detectives Mullen and Brzeski. While in the police car and on the way to Nassau County Police Headquarters, Detectives Mullen and Brzeski gathered pedigree information from Caulfield.

Upon arrival at the Police Headquarters, Caulfield was placed in an interview room inside the Homicide Squad with Detectives Mullen and Brzeski. There, Caulfield was read his constitutional rights, and he and Detectives Mullen and Brzeski signed the "rights card." Again, Caulfield voluntarily waived his right to silence and an attorney and spoke with Detectives Mullen and Brzeksi.

Detective Mullen showed Caulfield a picture of Brockwell, after which Caulfield stated that he never saw Brockwell before and was never in his company. When asked if the Petitioner had any ex-boyfriends, Caulfield said he knew she had a boyfriend Glenn but never met him.

Thereafter, Caulfield admitted that he knew Brockwell and said "he was a piece of shit." After making further derogatory comments about Brockwell, Caulfield said that the Petitioner and Marie had nothing to do with this, and the responsibility was all his.

Caulfield stated that, on the night of the Brockwell killing, he was at a bar when Marie called him and said that Brockwell had beat up the Petitioner. Caulfield said he went to 30 Forest Avenue and observed bruises on the Petitioner. Shortly thereafter, Caulfield said he punched Brockwell in the chest and Brockwell fell on the couch and was gasping for air. At that point, Caulfield said he took a needle with heroin and injected it into Brockwell's arm. Caulfield said he, Tom, the Petitioner, and Marie carried Brockwell's body to the garage and covered him with clothing. Caulfield said that, the following night, he and Tom covered Brockwell's body with garbage bags, put it in the trunk of the Petitioner's car, and drove to the Parkside Preserve in Massapequa. Caulfield said that, there, he and Tom dug a hole, placed Brockwell's body in the hole, covered it with dirt and branches, and then left.

Detective Mullen prepared a written statement reflecting these admissions and read it to Caulfield, who then read and signed the statement.

### 4. Marie's Interrogation

On August 22, 2001, at approximately 5:35 P.M., Marie was placed under arrest by Detectives McHugh and Cereghino and driven to Nassau County Police Headquarters. Marie was then placed in an interview room with Detectives McHugh and Cereghino. There, Marie was read her constitutional rights, and she and Detectives McHugh and Cereghino signed the

"rights card." Marie then voluntarily waived her right to silence and an attorney and spoke with Detectives McHugh and Cereghino.

Marie indicated that, a couple of days before Easter 2000, she was at home at with Tom and the Petitioner when Brockwell came home drunk. According to Marie, the Petitioner prepared Brockwell with some food and a drink. Shortly thereafter, Marie said that she was upstairs with Tom and the Petitioner when Caulfield came over. Marie said while the Petitioner and Caulfield and Tom conversed, she heard someone say that Caulfield had a needle containing heroin. Then, Marie said O'Rourke arrived at the house and came upstairs. Marie said she then heard Caulfield ask O'Rourke to hold Brockwell's shoulders down.

Marie said they all went downstairs where Brockwell was asleep and laying on his back in the couch. Marie stated that she stood by Brockwell's right leg; Tom stood by Brockwell's left leg; O'Rourke stood behind Brockwell's head; and Caulfield and the Petitioner stood on the right side of Brockwell. Marie stated that Caulfield then held a pillow over Brockwell's face and injected him in the right arm with a needle. Marie further stated that, at that point, Brockwell stirred and murmured some words that she could not understand and kicked his legs out. Marie said she and Tom held Brockwell's legs down and O'Rourke held Brockwell's shoulders down. Marie stated that, about a minute later, Caulfield injected Brockwell a second time with a needle and Brockwell did not move after that.

Marie said, the next day, she observed Brockwell's body in the garage wrapped in a tarpaulin. Marie related that, either that night or the next night, Caulfield and Tom put Brockwell's body in the trunk of the Petitioner's car. Marie stated Caulfield and Tom had a shovel, left in Arena's car for a couple of hours, and then returned all covered in dirt.

About a week later, Marie said Tom showed her the spot in the Massapequa Preserve where they buried Brockwell's body.

Detective Cereghino prepared a written statement reflecting these admissions and read it to Marie, who then read and signed the statement.

## B. **Procedural Background**

The Petitioner was indicted on one count of murder in the second degree (Penal Law § 125.25(1)) and one count of tampering with physical evidence (Penal Law § 215.40.2) in connection with the Brockwell killing. Co-defendant Caulfield was indicted on two counts of murder in the second degree, one count of tampering with physical evidence, and one count of criminal possession of a weapon in the third degree. Marie was indicted for two counts of murder in the second degree and one count of tampering with physical evidence.

Prior to trial, Supreme Court, Nassau County held a joint Dunaway/Huntley hearing with co-defendants Marie and Caulfield. At issue for the Petitioner was the admissibility of her post-arrest oral and written confessions to police in which she admitted her role in the murder of Brockwell. The court heard testimony from, among others, Detectives Lesmeister, McHugh, Brzeski, and from Caramelli.

In a written decision dated April 25, 2003, Justice Ira Wexner denied the Petitioner's motion to suppress. The court found that (1) probable cause existed for the arrest of the defendants; (2) the Petitioner knew and understood her constitutional Miranda rights and acknowledged the same; (3) the Petitioner knowingly waived those rights and knowingly, voluntarily, and freely gave a statement; (4) the oral statement made by the Petitioner to Detective Lesmeister after being arrested and in the police car was not elicited in response to custodial interrogation and as such was constitutionally proper and required no reading of

<u>Miranda</u> rights; and (5) the Petitioner was not represented by an attorney, Justin Lite, prior to her arrest, and Lite did not appear on the Petitioner's behalf as her attorney in connection with any criminal charges.

Marie subsequently pleaded guilty to one count of manslaughter in the first degree and Caulfield pleaded guilty to murder in the second degree.

Following the Petitioner's trial, the relevant portions of which will be described in detail later, on November 9, 2004, a jury convicted her of one count of murder in the second degree and one count of tampering with physical evidence.

On March 22, 2005, County Court, Nassau County (Weinberg, J.) sentenced the to an indeterminate term of 20 years to life imprisonment on the conviction of murder in the second degree and 1 and 1/3 to 4 years imprisonment on the conviction of tampering with physical evidence, to run consecutively.

On April 1, 2005, Caulfield was sentenced to a prison term of twenty years to life. His judgment of conviction was later affirmed on appeal, <u>People v. Caulfield</u>, 57 A.D.3d 796, 868 N.Y.S.2d 908 (2d Dept. 2008).

On April 15, 2005, Marie was sentenced to a six-year prison term and five years of post-release supervision. She has not filed a notice of appeal.

O'Rourke was given immunity in exchange for his cooperation in the prosecution of Arena.

On May 6, 205, Caramelli was sentenced to six years' imprisonment in connection with the murder of Tom.

The Petitioner appealed her judgment of conviction, bringing up for review the trial court's denial of the suppression of her statements to law enforcement officials. The Petitioner

raised the following claims on appeal to the Appellate Division: (1) she was deprived of a fair trial when the prosecutor was allowed to cross-examine her with regard to the death of her son-in-law, Tom, and to suggest that she was responsible for his death; (2) defense counsel was ineffective for not requesting a missing witness charge for Caramelli; (3) the prosecutor improperly cross-examined her regarding her statement to law enforcement which, she alleged, was fabricated by the police from a statement given by Caramelli, and her right to confront witnesses was violated when, in rebuttal, the prosecutor elicited from the detective who questioned her what information in her statement had not come from Caramelli; (4) her statement was admitted into evidence in violation of her right to counsel; (5) she was denied the right to present evidence that her confession was involuntary; (6) the trial court's instructions on accomplice corroboration diluted the prosecution's burden of proof and deprived her of a fair trial; (7) she was deprived of the right to present a defense by the trial court's refusal to allow her to recount what accomplice O'Rourke said at the time of the commission of the crime; and (8) the imposed sentence was excessive.

In a decision dated January 19, 2012, the Appellate Division, Second Department modified the Petitioner's judgment of conviction as a matter of discretion in the interest of justice and directed that her terms of imprisonment run concurrently. However, it unanimously affirmed the judgment in all other respects. In particular, it found that: (1) the lower court properly declined to suppress the Petitioner's statement because at the time she made it, formal proceedings had not yet commenced, she did not unequivocally invoke her right to counsel, and no attorney representing her had entered the matter at the time of the initial investigation into the victim's disappearance; (2) any error by the prosecutor regarding the Petitioner's cross-examination and the unrelated murder of her son-in-law was "harmless, in light of the

overwhelming evidence of guilt"; (3) the Petitioner failed to preserve for appellate review her

contention regarding the jury charge on accomplice corroboration; (4) the Petitioner received

meaningful representation; and (5) the remaining contentions were "without merit." People v.

Arena, 69 A.D.3d 867, 894 N.Y.S.2d 467 (2d Dept. 2010). The Petitioner sought leave to appeal

to the New York Court of Appeals. On April 14, 2010, the Court of Appeals denied leave, 14

N.Y.2d 838, 927 N.E.2d 565, 901 N.Y.S.2d 144 (2010).

## C.  **The Present Petition**

On June 7, 2011, Arena filed the instant petition for a writ of habeas corpus pursuant to

28 U.S.C. §2254. She raises several claims, including that: (1) the prosecutor committed

misconduct by falsely implying that the Petitioner was involved in her son-in-law's murder; (2)

rebuttal testimony from Detective Lesmeister violated her right to confront witnesses; (2) her

trial counsel was ineffective for not requesting a missing witness charge; and (3) the Petitioner

was denied the right to present a defense by the state court's (a) preclusion of evidence that her

confession was involuntary; (b) refusal to allow her to recount what accomplice O'Rourke said

just after Brockwell's murder which, she alleges, suggest that he falsely implicated her in the

murder. Accordingly, the Petitioner does not now reassert that (1) her statement should have

been suppressed because it was obtained in violation of her right to counsel; (2) the jury charge

on accomplice corroboration deprived her of a fair trial; and (3) her sentence was excessive.

## II. DISCUSSION

## A.  **Standard of Review**

Arena files this petition pursuant to 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall
> not be granted with respect to any claim that was adjudicated on

the merits in State court proceedings unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A petitioner will prevail on a claim under Section 2254(d)(1) only if she can show that "the state court arrive[d] at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decide[d] a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). Relatedly, a petitioner will prevail on a claim that insufficient evidence supported the state court's finding only if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); see also McDaniel v. Brown, 558 U.S. 120, 130 S. Ct. 665, 175 L. Ed. 2d 582 (2010) (reaffirming the standard of review set forth in Jackson). Further, a state court's determination of a factual issue is presumed to be correct, and may only be rebutted upon a showing of clear and convincing evidence by the petitioner. See §2254(e)(1). Finally, in analyzing the sufficiency of the evidence at trial, the Court must "look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999).

**B.  As to the Alleged Prosecutorial Misconduct**

Improper remarks by a prosecutor during the course of a criminal trial can rise to the level of an unconstitutional deprivation of the right to a fair trial. See Darden v. Wainwright, 477 U.S. 168, 180-81, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). However, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." Id. at 181 (internal

quotation marks and citation omitted).  "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11-12, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).  Rather, to establish a constitutional violation, the improper remarks must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)) (internal quotation marks omitted); see also Jenkins v. Artuz, 294 F.3d 284, 294-95 (2d Cir. 2002).  Thus, improper remarks by a prosecutor "do not amount to a denial of due process unless they constitute egregious misconduct." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (internal quotation marks and citations omitted); see also Miranda v. Bennett, 322 F.3d 171, 180 -- 81 (2d Cir. 2003).

In assessing whether prosecutorial misconduct resulted in an unconstitutional conviction, a court must consider the improper remarks in the context of the trial as a whole.  See Young, 470 U.S. at 11 (a prosecutor's alleged misconduct "must be viewed in context"); Donnelly, 416 U.S. at 643 (assessment of whether prosecutorial remarks deprived defendant of a fair trial requires "examination of the entire proceedings"); United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994) ("[W]e must evaluate the challenged remarks in the context of the trial as a whole").

Here, on her direct examination, the Petitioner accused the police of fabricating her confession and falsely implicating her in the Brockwell killing.  The Petitioner testified that when questioned by Detective Lesmeister at the police station, she denied holding a pillow over Brockwell's face or being present when Brockwell was murdered.  (Tr. at 1050.)  Further, the Petitioner stated that Detective Lesmeister then "came in with a statement," demanded that she

sign it, and when she refused, threatened to arrest her daughter. According to the Petitioner, she capitulated and signed the statement without reading it. (Tr. at 1050-51.)

To refute this testimony, and to complete the narrative on how Brockwell's body was discovered and how, in fact, the police zeroed in on the Petitioner in connection with the Brockwell murder, the People attempted to elicit on cross-examination that the Petitioner's alleged accomplice, Tom, recounted how the murder occurred – and implicated the Petitioner and her cohorts – to Caramelli, who later passed the information on to the police. In addition, to convince the jury that Tom made that damaging disclosure, and to explain why Tom was neither a witness nor a codefendant at the Petitioner's trial, the People asked the Petitioner if Tom was killed shortly after Brockwell's murder, and if the Petitioner knew whether Tom had told anyone about the murder. The colloquy went as follows:

Q. Okay. Now, Tom Cannata, where is he today?

A. He is dead.

Q. He is dead. He was shot in the head?

A. Yes.

Q. C orrect? Your daughter was standing right next to him when he got shot in the head?

A. She wasn't standing next to him, but she was in the room.

Q. But that is different than standing next to him?

A. She was sitting on the bed next to the computer where his friend shot him.

Q. Okay. That was a few months after you, him and Joe Caulfield murdered Glenn Brockwell?

A. I did not murder anybody.

[Objection based on relevance overruled.]

Q. Was this – did this occur a few months after?

A. Yes, it did.

Q. Okay. That was after, that was after Tom Cannata told Steven Caramelli that you, Joe Caulfield and your daughter, Marie –

A. I have no idea what Tom told Steve Caramelli.

Q. You know he was murdered after that?

A. Yes, but I had no idea what Tom told Steve Caramelli.

Q. You had conversations about this with your daughter, didn't you?

[Defense Counsel]: Objection, Your Honor.

A. With what witnesses about my daughter?

[The Court]: Excuse me. You had conversations with who?

Q. Your daughter, Marie.

A. Did I talk with my daughter?

Q. Yes.

A. Yes, all the time.

Q. About the fact that Tom was telling people about how you guys murdered Glenn?

A. I did not murder anyone. Neither did my daughter.

[Unspecified objections overruled. Objections based on hearsay sustained.]

. . .

Q. Did you have conversations with your daughter over the fact that Tom had told someone about the murder?

[Defense Counsel]: Objection, Your Honor.

[The Court]: Yes or no?

A. No.

Q. Did you have conversations with Joe Caulfield about the fact that Tom Cannata had told someone about the murder; yes or no?

A. Absolutely not.

Q. So, you never had any discussions with anyone over the fact that Tom Cannata had spoken to Steven Caramelli and told him about the murder?

[Defense Counsel]: Objection, Your Honor.

[The Court]: Overruled.

A. No.

Q. You're sure about that?

A. Yeah, I am.

Q. Did you ever speak to Steven Caramelli about the murder; yes or no?

A. It's not a yes or no answer. I can't give you –

[The Court]: If you can't answer yes or no, just say so.

A: I can't answer yes or no.

Q. Did you have a conversation with Steven Caramelli?

A: Yes, I did.

Q. Steven Caramelli was a friend of your daughter's?

A. Yes, he was.

Q. And he was a friend of Tom Cannata?

A. Yes, he was.

Q. And, Steven Caramelli had conversations with your daughter and Tom Cannata in your presence?

A. No, he did not.

Q. But you had a conversation with Steven Caramelli?

A. The conversation, if you're talking –

Q.  Yes or no?

A.  If you're talking about a conversation – I had a conversation with Steven.  I had conversations with Steven in front of Tom and Marie.

Q.  That was my question.

[The Court]: Okay.

Q.  That was my question.

A.  Yes.

Q.  Did you?

A.  Yes.

Q.  And, in those conversations, did Mr. Caramelli and you discuss blaming this murder on Joe Caulfield?

A.  Absolutely not.

Q.  Never happened?

A.  Never happened.

Q.  Okay, But you did have conversations with Mr. Caramelli?

A.  Yeah, conversations, not about –

Q. Never talked about the murder?

A. No.

Q. Never once?

A. No.

Q. Not one conversation?

A.  It wouldn't be –

Q. Just yes or no?

[The Court]: Yes or no?

A: Yes, towards the end, before this happened, yeah, we did.

Q. So did you talk to him?

A. Not about the murder, but about his – you want me to give you a yes or no answer?

Q: All my question is, did you talk to him about the murder?

A. Not about the murder per se, no.

(Tr. at 1075-81).

Here, put simply, the Petitioner contends that she was denied her due process rights when the prosecutor allegedly suggested, on cross-examination, that she and her daughter participated in the murder of her accomplice and son-in-law, Tom, in order to prevent him from disclosing information about Brockwell's murder. As noted above, the Appellate Division determined that "any alleged error" by the prosecutor in this regard "was harmless, in light of the overwhelming evidence of guilt, and the fact that there [was] no significant probability that the alleged error might have contributed to [the Petitioner]'s conviction." People v. Arena, 69 A.D.3d 867, 868–69, 894 N.Y.S.2d 467 (2d Dep't 2010).

As an initial matter, it is not clear that a habeas petitioner's challenge to a state trial court's rulings permitting certain cross-examination is cognizable on federal habeas review. Marshall v. Walker, 464 U.S. 951, 952, 104 S. Ct. 367 (1983) (Rehnquist, J., dissenting) (stating that certiorari should have been granted to review whether trial court rulings on the scope of prosecutorial cross-examination and rebuttal testimony are cognizable on federal habeas review, and noting that several Supreme Court cases "strongly suggest that they are not.")

However, assuming such a claim is cognizable, the Court finds that the Petitioner's prosecutorial misconduct – reviewed *de novo* because the state courts declined to pass on its merits – fails to establish a right to habeas relief. The questioning at issue served to elicit an

admission that Tom or someone else involved in Brockwell's murder had discussed it with

Caramelli. (Tr. at 1076-78). Indeed, when the Petitioner denied knowing if Tom made the

disclosure, the People asked whether the Petitioner herself had discussed Brockwell's murder

with Caramelli. (Tr. at 1079.) The People did not suggest that the Petitioner had anything to do

with Tom's death. Furthermore, the People never asked the Petitioner if she had been accused of

killing Tom or if she knew who had killed him. While the People asked whether the Petitioner's

daughter was with Tom when he was killed, this did not suggest that the Petitioner's daughter,

much less the Petitioner, was responsible for Tom's death.

In addition, the questioning served the purpose of accounting for Tom's absence at the

Petitioner's trial. Every other accomplice in Brockwell's murder was either a witness or a co-

defendant; Tom was the only unaccounted-for accomplice. In this way, "the fact of [Tom's

death] completed the narrative [of Brockwell's murder] and the trial court was within its

discretion under New York law to admit it." Yapor v. Mazzuca, No. 04 Civ. 7966, 2005 WL

894918, * 17 (S.D.N.Y. Apr.19, 2005) (citations omitted), report and recommendation adopted,

2005 WL 1845089 (S.D.N.Y. Aug.3, 2005).

Contrary to the Petitioner's contention, this case does not resemble People v. Ashwal, 39

N.Y.2d 105, 109-10, 383 N.Y.S.2d 204, 206-07 (1976) (citations omitted) (conviction reversed

because "prosecutor's [summation] remark definitely conveys the impression that [informant]

was killed by those he had informed upon, one of whom was this defendant"; prosecutor may not

"try to convey to the jury, by insinuation, suggestion or speculation, the impression that the

defendant is guilty of other crimes not in issue at the trial"). Here, the People did not argue or

suggest on summation that the Petitioner or her daughter was responsible for Tom's death;

indeed, the Prosecutor did not mention Tom's death on summation.

To the extent the Petitioner challenges the admission of testimony regarding uncharged "bad acts" under a New York state evidentiary rule, this argument does not implicate clearly established federal law and thus, is not cognizable on federal habeas review. See e.g., Sierra v. Burge, No. 06–14432, 2007 WL 4218926, at *5 (S.D.N.Y. Nov. 30, 2007). Indeed, "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Moreover, the Supreme Court has expressly declined to decide whether admitting evidence of uncharged crimes violates a defendant's due process rights, see id. at 75 n. 5, and consequently there is no "clearly established Federal law[ ] as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

Furthermore, even if the questioning of the Prosecutor were improper, the Petitioner is not entitled to habeas relief unless the questioning had a "substantial and injurious effect or influence in determining the jury's verdict." Wood v. Ercole, 644 F.3d 83, 93–94 (2d Cir. 2011) (citation and quotation mark omitted). In determining whether a petitioner has suffered actual prejudice, the Court considers "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998) (internal quotation marks omitted); see also Bessaha v. Rock, No. 09–CV–3581, 2012 WL 1458195, at *17 (E.D.N.Y. Apr. 27, 2012) (finding that, even if prosecutor's comments were improper, petitioner was not entitled to habeas corpus relief because petitioner had "failed to show that his conviction was uncertain absent the challenged prosecutorial conduct"). The Court must examine each instance of alleged misconduct "in the context of the entire trial." Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir.

2003) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 639, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).

In the case at bar, the Court finds that the alleged misconduct at issue is not particularly severe.  Again, the Prosecutor never asked the Petitioner if she had been accused of killing Tom or if she knew who had killed him.  On the other hand, the state court did not take any curative measures aimed at the supposed misconduct.  Rather, the state court overruled the Petitioner's objections to the questioning at issue.  <u>Ashwal</u>, 39 N.Y.2d at 111 ("when, as here, the court overrules the defendant's objections, and gives 'standing to the statement of the district attorney as legitimate argument' . . . the possibility of prejudice is greatly enhanced" (internal citations omitted); <u>People v. Payne</u>, 187 A.D. 2d 245, 250 (4th Dept. 1993) ("[t]he trial court's failure to rein in the prosecutor and take corrective action 'seemingly put the court's imprimatur on [the prosecutor's improper remarks] in the eyes of the jury'")(citation omitted).

That said, the Court finds that the severity of any alleged misconduct and the lack of any curative instructions is outweighed by the overwhelming evidence of the Petitioner's guilt. <u>Hughes v. Phillips</u>, 457 F.Supp.2d 343, 367 (S.D.N.Y.2006) ("In light of the overwhelming evidence of petitioner's guilt, [and] the collateral nature of the [disputed] evidence . . . even if it were error to admit such testimony . . ., the error was not of such magnitude as to have denied him a fundamentally fair trial.")  The Petitioner's accomplice, O'Rourke, testified that the Petitioner held a pillow over Brockwell's face as Caulfield injected him in the right arm with a lethal overdose of heroin.  (Tr. at 829-31.).  O'Rourke also testified that the Petitioner admitted to him that she knocked Brockwell out with a cocktail and that, in the presence of Caulfield, who was holding a hypodermic needle, she had asked O'Rourke to "sit on Glenn." (Tr. at 828.)  It is true that O'Rourke was given complete immunity in exchange for his testimony against the

Petitioner and the Second Circuit has deemed confessions of accomplices are "presumptively unreliable." Howard v. Walker, 406 F.3d 114. However, the Petitioner's confession to police – made independent of O'Rourke's statement – substantiated O'Rourke's account of the crime and the Petitioner's role in it. (Tr. at 601-05, 612)

In addition, according to a medical examiner, Brockwell's autopsy confirmed a high level of opiates in his system (Tr. at 485, 494.) Moreover, after Brockwell's death, there was evidence that the Petitioner (1) spent Brockwell's money and disposed of his property (Tr. at 606-07, 700-01.); (2) lied to Brockwell's family about the circumstances of his disappearance and whether she had filed a missing person report (Tr. at 381-85, 396-400.); and (3) encouraged her teenage son to contact the imprisoned Caulfield and ask him to take sole responsibility for Brockwell's murder (Tr. at 1149-53). Given the strength of the evidence against the Petitioner, the Court finds no constitutional error in the Appellate Division's conclusion that there was "no significant probability that the alleged error might have contributed to [petitioner']s conviction." Quinney v. Conway, 784 F. Supp. 2d 247, 257 (W.D.N.Y. 2011)

For the same reason, the Court finds no prosecutorial misconduct in the Prosecutor's statement on summation that Brockwell could not have had a drug or alcohol problem because he held two jobs. This statement (1) constituted a fair comment on the evidence, which included the testimony of a medical examiner that she noticed no scarring on Brockwell's arm suggestive of chronic drug use (Tr. at 502.) and (2) was responsive to the Petitioner's summation, in which it was argued that Brockwell was a substance abuser. (Tr. at 1413.) Similarly, the Court finds no bad faith in the Prosecutor's choice not to call Caramelli as a witness – there is no reason why the Petitioner could not have called Caramelli.

**C. As to the Alleged Confrontation Clause Violations**

"The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, guarantees the defendant in a criminal prosecution the right to confront the witnesses against him." Henry v. Speckard, 22 F.3d 1209, 1214 (2d Cir. 1994) (citation omitted). Thus, the Confrontation Clause prohibits the prosecution from introducing testimonial hearsay – i.e., "testimonial" statements by a non-testifying declarant that are admitted for the truth of the matter asserted – unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. Crawford v. Washington, 541 U.S. 36, 53–57, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); see also Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.").

Here, after the Petitioner testified on direct examination that the police fabricated her confession, the Prosecutor questioned her about what she told the police and why she believed they had fabricated it. In this regard, the Petitioner denied giving Lesmeister the details of what occurred the night Brockwell was killed. (Tr. at 1126-32). She also denied saying that she held a pillow over Brockwell's face, or that her daughter, Marie, held Brockwell's feet down. (Tr. at 1103, 1132.) In response to this denial, the Prosecutor asked whether the Petitioner observed anyone tell Lesmeister that her daughter was involved in killing Brockwell and asked why Lesmeister would want to implicate the Petitioner's daughter in the killing. (Tr. at 1132-33.) The Petitioner responded that Lesmeister obtained his information from a statement given by Caramelli "to get his sentence [for killing Tom] reduced," and that Lesmeister used that statement, "which [wa]s almost exactly like [her] statement," to manufacture her written

confession. (Tr. at 1133.) On redirect examination, the Petitioner reiterated that the statement had been "all written" from the moment she saw it and that she did not hold a pillow over Brockwell's face (Tr. at 1259, 1261.)

Thereafter, the state trial court ruled that the Petitioner had "opened the door" to testimony by Detective Lesmeister to establish that Caramelli was not the source of the information in the Petitioner's statement. To that end, the Prosecutor inquired:

> Q. Now, is it fair to say that you had information from Steven Caramelli about what transpired on Good Friday at 30 Forest Avenue?
>
> A. Yes.
>
> Q. Okay. Now could you tell the jury what information did Steven Caramelli not tell you that you found out when you interviewed the [Petitioner]? Explain to the jury?
>
> A. Well, there w[ere] numerous things. The first thing I think was the fact that Tierney O'Rourke was involved. I never heard of him, I never knew that he was involved. I knew there were four people involved. I didn't know there was five. I didn't know that the fifth person was Tierney O'Rourke.
>
> Q. That piece of information from, that Tierney O'Rourke was involved in the actual murder came from the defendant?
>
> A. Absolutely.
>
> Q. What else?
>
> A. Well, not chronologically, but eventually I found out that the defendant had used Glenn Brockwell's Home Depot credit car[d]. I didn't know that. I didn't know that Glenn Brockwell took out a $150,000 mortgage on the house and that [the] house was transferred to his name, and it stayed that way until February 2000. I didn't know that when they held him down, that they shot the heroin into his right arm. I didn't know he was laying [sic] on the couch in the living room when they did it. I didn't know what he was wearing. I didn't know that when they were holding him down and they stuck him with the heroin that he woke up and said hey, this isn't funny. Let me go.
>
> Q. What about moving Glen Brockwell's truck?
>
> A. Yea. That they brought his truck to the Bayshore train station.

Q. So, that was essentially the information that you didn't have from Steven Caramelli, and those particular points were given to you by the defendant?

A. Yes.

(Tr. at 1327-29.)

The Petitioner now contends that the Prosecutor engaged in improper questioning of her about why Detective Lesmeister would want to implicate her daughter in the Brockwell murder. Further, the Petitioner asserts that she did not "open the door" to Detective Lesmeister's rebuttal testimony – which Petitioner contends contained "rank hearsay" – because Lesmeister had previously mentioned that he received information about the Brockwell murder from Caramelli. The Petitioner further surmises that the Prosecutor deliberately engineered the admission of this evidence – that is, Lesmeister's testimony that the Petitioner's claim was nothing more than a written regurgitation of what Carmaelli had told the police – because Caramelli would not have been a credible witness. Indeed, Caramelli was given a lie detector test and when asked if he was involved in the Brockwell murder, the results were "inconclusive."

As a preliminary matter, there was nothing inappropriate about the Prosecutor's question to the Petitioner regarding why Detective Lesmeister would want to implicate her daughter in the Brockwell murder. This question was directly responsive to the Petitioner's assertion that Lesmeister fabricated her confession. Furthermore, the Court finds that, by repeatedly alleging that the police fabricated her confession, the Petitioner "opened the door" to Lesmeister's rebuttal testimony explaining the source of his information about the Brockwell Murder. People v. Mateo, 2 N.Y.3d 383, 779 N.Y.S.2d 399, 811 N.E.2d 1053, 1079 (2004).("When a party 'opens the door' during cross-examination to excluded evidence, the opponent may seek to admit

the excluded evidence in order to explain, clarify and fully elicit the question that has been only partially exposed on cross-examination.")

In addition, the Court finds that the Petitioner's constitutional right to confront witnesses was not violated. It is true, as here, that testimony need not contain an explicit assertion in order to be excluded as a violation of the Confrontation Clause." <u>Ryan v. Miller</u>, 303 F.3d 231, 248 (2d Cir. 2002). As such, testimony that implies that an out-of-court declarant made an accusation against the defendant may violate the Confrontation Clause. In <u>Ryan</u>, for example, the petitioner was tried and convicted of second-degree murder. At petitioner's trial, the detective who supervised the investigation testified as a prosecution witness. He testified that, during the investigation of the murder, petitioner and another individual, Peter Quartararo, had come to a police station for interviews and were being interviewed in separate rooms by different detectives. The prosecutor asked the supervising detective whether, "as a result of" speaking to the detectives interviewing Peter Quartararo, he had "done something with respect" to the detectives interviewing petitioner. The supervising detective responded that he did. When asked by the prosecutor "[w]hat was that," he said he had told the detectives to "advise [petitioner] of [his] rights." The prosecutor followed up by asking "[a]s to what charge?" The detective answered "[m]urder." On habeas review, the Second Circuit found that this testimony contained an implicit accusation by Quartararo – who did not testify at petitioner's trial – that the petitioner had been involved in the murder. <u>See</u> 303 F.3d at 251–52 ("The People's direct and clear suggestion that police gave [petitioner] Miranda warnings because of what [Quartararo] said is not meaningfully distinct from testimony repeating those portions of [Quartararo's] testimony that inculpated [petitioner]."). Thus, the court held that testimony implying that a non-testifying

declarant had inculpated the petitioner violated the petitioner's Confrontation Clause rights.  See id.

However, there is no Confrontation Clause issue when, as here, the out-of-court statements are admitted for purposes other than showing the truth of the matter asserted.  See Crawford, 541 U.S. at 59 n. 9; United States v. Logan, 419 F.3d 172, 177 (2d Cir. 2005).  Hence, courts have allowed the introduction of out-of-court statements not for their truth, but to provide background information. See e.g. Logan, 419 F.3d at 177–79 (finding no Confrontation Clause violation when court allowed admission of co-conspirators' out-of-court statements to detectives); Newland v. Lape, No. 05 Cv. 2686(JFK), 2008 WL 2485404, at *5 (S.D.N.Y. June 19, 2008) ("Although out of court statements offered for the truth of the matter asserted are generally inadmissible as hearsay, statements admitted merely to complete a narrative or explain the actions of a police officer are admissible.") (internal citations and quotation omitted)); see also Carroll v. Greene, No. 04 Civ. 4342(RWS), 2006 WL 2338119, at *17 (S.D.N.Y. Aug.11, 2006) (finding that hotel employee's testimony regarding gestures made by hotel guests towards petitioner was not testimonial hearsay because it was introduced for the purpose of showing why employee attempted to apprehend petitioner).  The Second Circuit has stated that "[t]estimony containing hearsay may be admissible not for its truth but as background information if (1) the non-hearsay purpose by which the evidence is sought to be justified is relevant and (2) the probative value of this evidence for its non-hearsay purpose is [not] outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement."  Ryan, 303 F.3d 231, 252 (2d Cir. 2002).

More specifically, courts have allowed the introduction of out-of-court statements intended to explain how and why a criminal defendant made a confession and to rebut a

defendant's argument that the confession was coerced.  See e.g. Tennessee v. Street, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985) (finding evidence of non-testifying co-conspirator's confession admissible to show defendant's confession was not coerced).  In Klimawicze v. Trancoso, 313 F. Appx 904 (7th Cir. 2009), for example, a habeas petitioner had confessed to murdering her mother.  The confession came after her accomplice saw her in the interrogation room and told her that he had "told [police] the truth." The accomplice's statement was admitted at the petitioner's trial through the testimony of a detective and an assistant state's attorney. 313 F. Appx at 905.  The Seventh Circuit found, under the AEDPA standard of review, no Confrontation Clause violation occurred because the accomplice's statement was not admitted for the truth of the matter asserted, but to "explain why [petitioner] confessed shortly thereafter." Id. at 904.

    As an initial matter, although the Appellate Division did not directly address the Petitioner's confrontation clause argument, "a terse statement that remaining contentions are without merit suffices to trigger AEDPA's heightened standard of review." Dallio v. Spitzer, 343 F.3d 553, 562 n. 3 (2d Cir. 2003); see also Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").  In any event, the Court rejects the Petitioner's confrontation clause claim because no hearsay testimony was elicited inasmuch as the Petitioner fails to point to a single piece of testimony whereby Lesmeister recounted or summarized a statement by Caramelli.  Rather, Lesmeister merely confirmed the content of the Petitioner's confession that he did not also obtain from Caramelli.

Furthermore, any "references to the out-of-court statements did not violate the Confrontation Clause because the references were used to explain the background of petitioner's confession and to rebut the defense argument that the detectives coerced the confession." Reyes v. Ercole, 08-CV-4749 (JFB), 2010 WL 2243360, at *9 (E.D.N.Y. June 1, 2010); cf. Ryan, 303 F.3d at 253 (declining to apply background exception because "[t]he testimony was not necessary or relevant to a material issue in the case – it did not offer an explanation for something about which the jury would be curious," and, even if relevant, was unduly prejudicial). In the Court's view, the Petitioner's characterization of Lesmeister's testimony as unduly prejudicial is conclusory at best.

Finally, even if the state court erred in allowing the detectives to refer to the out-of court-statements, any error was harmless for purposes of habeas review. See Fry v. Pliler, 551 U.S. 112, 121, 127 S. Ct. 2321, 168 L. Ed.2d 16 (2007) (holding that "in § 2254 proceedings a [federal] court must assess the prejudicial impact of constitutional error in a state-court criminal trial" by determining whether the error had a "'substantial and injurious effect' " on the jury's verdict) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)); see also United States v. McClain, 377 F.3d 219, 222 (2d Cir. 2004) ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review, . . . and Crawford does not suggest otherwise."). As noted above, aside from Lesmeister's rebuttal testimony, the jury had before it O'Rourke's testimony inculpating the Petitioner; the Petitioner's confession; Brockwell's autopsy; and the Petitioner's highly suspicious behavior following Brockwell's death.

**D. <u>As to the Alleged Ineffective Assistance of Counsel</u>**

The Petitioner separately contends that his trial counsel was ineffective for failing to request a missing witness charge with respect to the Prosecution's failure to call Carmella to testify at trial. The Appellate Division rejected this argument, concluding that the Petitioner received "meaningful representation." "Because the state court adjudicated the merits of his claim, [the Petitioner] must prove that the state court either identified the federal standard for ineffective assistance but applied that standard in an objectively unreasonably way, or that the state applied a rule that contradicts the federal standard." <u>Rosario v. Ercole</u>, 601 F.3d 118, 122 (2d. Cir. 2010); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73, 75-76, 123 S. Ct. 1166, 155 L.Ed.2d 144 (2003); <u>Williams v. Taylor</u>, 529 U.S. 362, 387-89, 120 S. Ct. 1495, 146 L. Ed.2d 389 (2000).

The state court examined the Petitioner's claims under New York's constitutional standard for ineffective assistance. New York's constitution, like the U.S. Constitution, affords its citizens with the right to competent representation by an attorney. See U.S. Const. amend. VI; N.Y. Const. art. I, § 6; <u>see</u> <u>also</u> <u>People v. Baldi</u>, 54 N.Y.2d 137, 146, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981). However, New York's test for ineffective assistance of counsel under the state constitution differs from the federal <u>Strickland</u> standard. The first prong of the New York test is the same as the federal test; a defendant must show that his attorney's performance fell below an objective standard of reasonableness. <u>People v. Turner</u>, 5 N.Y.3d 476, 480, 806 N.Y.S.2d 154, 840 N.E.2d 123 (2005). The difference arises in the second prong of the <u>Strickland</u> test. <u>See</u> <u>id.</u> In New York, courts need not find that counsel's inadequate efforts resulted in a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Instead, the "question is whether the attorney's conduct constituted egregious and prejudicial error such that defendant did not receive a fair trial." <u>People v. Benevento</u>, 91 NY2d

91 N.Y.2d 708, 713, 674 N.Y.S.2d 629, 697 N.E.2d 584 (1998) (internal quotation marks omitted). Thus, under New York law, the focus of the inquiry is ultimately whether the error affected the "fairness of the process as a whole." Id. at 714, 674 N.Y.S.2d 629, 697 N.E.2d 584. The efficacy of the attorney's efforts is assessed by looking at the totality of the circumstances and the law at the time of the case and asking whether there was "meaningful representation." Baldi, 54 N.Y.2d at 147, 444 N.Y.S.2d 893, 429 N.E.2d 400.

The Second Circuit has repeatedly recognized that the New York "meaningful representation" standard is not contrary to the Strickland standard. Eze v. Senkowski, 321 F.3d 110, 123-24 (2d Cir. 2003); Lindtadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001). For this reason, "[t]he only avenue of reprieve available to [Petitioner] then is to establish that the state court unreasonably applied Strickland." Rosario, 601 F.3d at 126. Again, a state court "unreasonably applies" clearly established law when it identifies the correct legal principle from Supreme Court jurisprudence, but unreasonably applies the principle to the case before it. Williams, 529 U.S. at 412-13, 120 S. Ct. 1495. However, in order to prevail, the Petitioner must first satisfy the prongs of Strickland on *de novo* review of the merits. See Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005)

In this case, a review of the record indicates that trial counsel was not deficient in failing to request a missing witness charge. A party seeking a missing witness charge must demonstrate, among other things, that the witness would provide non-cumulative testimony. People v. Gonzalez, 68 N.Y.2d 424, 427, 509 N.Y.S.2d 796, 502 N.E.2d 583 (1986). A missing witness charge is not appropriate when the witness's testimony would merely corroborate the testimony of other witnesses. People v. Keen, 94 N.Y.2d 533, 539, 707 N.Y.S.2d 380, 728 N.E.2d 979 (2000). The People contend that Caramelli's testimony would not have added

anything to O'Rourke's testimony and the Petitioner's confession. Indeed, by the Petitioner's own admission, her confession was nearly identical to that of Caramelli's statement. In addition, Caramelli had no first-hand knowledge regarding Brockwell's murder because he was not present when it occurred. Rather, Caramelli learned the details of the murder from Tom and Marie, and thus any statements made by them may have been excluded as hearsay. Thus, in all likelihood, Caramelli would not have added any new information had he testified.

If anything, had trial counsel successfully requested a missing witness charge, the Prosecution may have called Caramelli as a witness, and Caramelli's testimony would have buttressed O'Rourke's testimony and the Petitioner's confession implicating the Petitioner in the Brockwell murder. People v. Peake, 14 A.D.3d 936, 936 (3d Dept. 2005)("[I]f defense counsel had made a timely request for such a charge, then the prosecution might have offered Berger as a limited rebuttal witness to buttress the prosecution's earlier, effective cross-examination of Severinghaus.")

Moreover, the Petitioner cannot show that she was prejudiced by his attorney's failure to request the charge. Even if the court had granted the request for a missing witness charge, there was "no significant probability that a properly instructed jury would have acquitted [the] defendant." People v. Vasquez, 76 N.Y.2d 722, 725, 557 N.Y.S.2d 873, 557 N.E.2d 109 (1990); People v. Robertson, 205 A.D.2d 243, 247 (1st Dept. 1994). The testimony of O'Rourke and the Petitioner's confession, coupled with Brockwell's autopsy and the Petitioner's behavior after Brockwell's death, provided compelling evidence that the Petitioner committed the crimes with which he was charged. Therefore, the state court did not unreasonably apply Strickland in finding that trial counsel's representation did not fall below an objective standard of reasonableness.

**E.  As to Whether the Petitioner's Right to Present a Defense Was Violated**

      **1.  As to Whether Petitioner was Denied Her Right to Present A Defense that her Confession to the Police Was Involuntary**

Upon learning that the Petitioner intended to call Lite as a witness, the Prosecutor requested an offer of proof.  (Tr. at 1307.)   The defense trial counsel responded:

> Mr. Lite was [petitioner]'s attorney for many, many years, and during this proceeding he was [a] witness to certain things.  He was involved in the calls to the missing person's report.  He can corroborate many of the things that [Petitioner] testified to.  And, in the fact that he was there and present during the course of those events.  I think his testimony is relevant to her defense.

(Tr. at 1307.)   The trial counsel explained that Lite would testify about "the course of his representation of [the Petitioner] . . . throughout the period of time from Mr. Brockwell's disappearance until shortly after her arrest." (Tr. at 1309.)  The Prosecutor countered that whether the Petitioner's right to counsel had attached was not a jury question and had already been resolved at the suppression hearing.  (Tr. at 1308-11.)  The court asked the trial counsel whether Lite had attempted to telephone the Petitioner when she was in custody, and counsel responded that Lite had not.  (Tr. at 1308.).  The court subsequently ruled that Lite could testify about his representation of the Petitioner on civil matters prior to her arrest, but not about whether the Petitioner wanted Lite to represent her in this case because "he can't testify as to what she wanted." (Tr. at 1311.)  The Petitioner ultimately declined to call Lite as a witness "in view of the limitations placed on what kind of testimony [she could] elicit." (Tr. at 1312.)

The Petitioner now argues, as she did on appeal in state court, that the trial court prevented her from calling Lite as a witness, thereby depriving her of the right to present a defense by eliciting, through Lite, that her confession was involuntary.  The Court disagrees.

In the Court's view, the trial court did not preclude the Petitioner from calling Lite as a witness to establish that her statements were involuntary.  Nor did the trial court comment on

whether the question of when the indelible right to counsel has attached can be re-litigated at trial. It merely ruled, in accordance with well-settled New York evidentiary principles, that Lite could only testify about matters drawn from his personal knowledge and could not recount what the Petitioner may have wanted or expressed to the police following her arrest. Regardless, the admissibility of the Petitioner's confession based on whether her indelible right to counsel had attached by virtue of Lite's prior representation was, pursuant to New York law, a matter of law for the court, not one of fact for the jury. Ridgeway v. Conway, 10-CV-6037 MAT, 2011 WL 3651147, at *7 (W.D.N.Y. Aug. 18, 2011) ("Even under New York law, the 'right to counsel' issue is not a 'voluntariness' issue to be submitted to the jury pursuant to C.P.L. §§ 60.45 and 710.70"); see also People v. Bynum, 275 A.D.2d 251, 252 (4th Dept. 2000). Thus, even if the state court had precluded the Petitioner from eliciting testimony from Lite regarding the voluntariness of her confession – which it did not – such a ruling would have comported with state evidentiary law. "Because [the Petitioner] has not demonstrated a violation of New York state law, much less any right guaranteed by the federal Constitution, habeas relief cannot issue on this claim." Ridgeway, 2011 WL 3651147, at *7).

**2. As to Whether Petitioner was Denied Her Right to Present A Defense by the Trial Court's Evidentiary Ruling Precluding Hearsay Statements by O'Rourke**

O'Rourke, who had been given immunity in exchange for his cooperation, testified that when he arrived at the house on the night of the Brockwell murder, he was totally unaware of any plot to kill Brockwell; and that after Brockwell was murdered, O'Rourke was beside himself and unable to sleep.

This testimony contradicted that of the Petitioner, who, on direct examination, began to testify as follows:

[The Petitioner]: [O'Rourke] was, [O'Rourke] was trying to make jokes to make everybody feel better, and he's like, You know, don't worry about anything, and then he said, I have to get, he said, I got to get back to the bar before people start missing me. And someone else said, what are you going to tell everybody where you were. And he said, oh, not a problem. I'm going to say I was at 7-Eleven and he had his hands up against the wall, and he said, I'm going to tell them I was getting – want me to say exactly what he said?

The Court: You can't say what he said.

[Defense Counsel]: Your Honor, there has already been testimony to this. She's entitled to contradict or affirm that testimony. There's been plenty of testimony [about] what people said to one another during that day and during that night.

[Prosecutor]: But that was all admissible evidence, Judge.

[Defense Counsel]: I don't know how that is admissible and this is not.

The Court: You can't say what [O'Rourke] said.

[Defense Counsel]: Your Honor, [O'Rourke], already testified that he committed this murder.

(Tr. at 1012-13.)

A colloquy followed, outside the presence of the jury, during which the trial counsel asserted that O'Rourke's statements following the murder provided "background and relate[d] to why [the Petitioner] took certain actions when she did and what she did," and that they were "very relevant . . . to her state of mind." (Tr. at 1014, 1016.) The trial counsel also insisted that it was difficult to separate "pure hearsay" statements from statements admissible as "declarations against interests, part of the *res gestae*, and everything else that occurred here." (Tr. at 1015.) The trial court excluded the Petitioner's testimony as to the O'Rourke's statements following the murder. The trial counsel later moved for a mistrial, asserting that the Prosecutor had raised excessive objections during the Petitioner's testimony. The trial court denied that motion as well. (Tr. at 1023.)

The Petitioner now contends that her testimony regarding O'Rourke statements after the Brockwell killing should have been admitted to refute his testimony that he was unaware of the plot to kill Brockwell when he arrived at the house and that he became upset about the killing. She contends that the testimony (1) was necessary to explain O'Rourke's motive to falsely implicate the Petitioner at trial; and (2) was admissible as part of the *res gestae* of the crime, an admission against penal interest, and under the coconspirator exception to the hearsay rule.

Again, the Appellate Division's catch-all rejection of this argument as "without merit" suffices to trigger deferential habeas review. However, the Petitioner's argument fails even on the predicate *de novo* review. "To qualify under th[e] exception [to hearsay for declarations against penal interest], the declarant must be unavailable, must have competent knowledge of the facts and must have known at the time the statement was made that it was against his or her penal interests." People v. Ennis, 11 N.Y.3d 403, 412, 900 N.E.2d 915, 872 N.Y.S.2d 364 (2008). Even if these criteria are met, the statement cannot be received in evidence unless it is also supported by independent proof indicating that it is trustworthy and reliable. See id.

Here, O'Rourke was not unavailable to testify but in fact did testify. Also, O'Rourke may not have been aware that his post-crime statements to the Petitioner about how he intended to lie about his whereabouts that night upon his return to work was against his penal interest because the statement did not directly implicate him in Brockwell's murder.

With respect to the co-conspirator exception,

> [a] declaration by a coconspirator during the course and in furtherance of the conspiracy is admissible against another coconspirator as an exception to the hearsay rule.' The theory underlying the coconspirator's exception is that all participants in a conspiracy are deemed responsible for each of the acts and declarations of the others. The exception 'is not limited to permitting introduction of a conspirator's declaration to prove that a coconspirator committed the crime of conspiracy, but, rather, may be invoked to support introduction of such

declaration to prove a coconspirator's commission of a substantive crime for
which the conspiracy was formed.'

People v. Caban, 5 N.Y.3d 143, 148, 833 N.E.2d 213, 800 N.Y.S.2d 70 (2005)(citations omitted).  However, as the People point out, "such declarations may be admitted only when a prima facie case of conspiracy has been established.  While the prima facie case of conspiracy 'must be made without recourse to the declarations sought to be introduced,' 'the testimony of other witnesses or participants may establish a prima facie case.'" Id.  Applying those criteria here, it is not clear that O'Rourke's post-crime statement was made during the course and in furtherance of a conspiracy with the Petitioner, much less that the Prosecution presented a *prima facie* case of conspiracy.  Indeed, the Petitioner was never charged with conspiracy.

In any event, the precluded testimony would not, if admitted, "create[] a reasonable doubt that did not otherwise exist." United States v. Agurs, 427 U.S. 97, 112, 96 S. Ct. 2392, 2402, 49 L. Ed. 2d 342 (1976).  Indeed, the Petitioner later testified, without objection, with regard to the essence of the earlier-precluded testimony.  In particular, the Petitioner recounted:

> And I think it was [Caulfield] turned around and said, what you going to say where you were, and [O'Rourke] put his hands up against the wall and he spread his legs and said, I'm going to tell everybody I was at 7-Eleven getting fucked by a gay guy, and he made a joke about it, and he left and went to the bar.

(Tr. at 1037.)  In light of this later-admitted evidence, the Petitioner cannot be heard to complain about its earlier exclusion.

## III. CONCLUSION

For the foregoing reasons, the habeas petition is denied. The Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
July 8, 2013

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge